Philip KLEIN, Plaintiff,

v.

AMERICAN LUGGAGE WORKS, INC., a Rhode Island corporation, John Wanamaker Philadelphia, Inc., a Pennsylvania corporation, and Strawbridge & Clothier, a Pennsylvania corporation, Defendants.

Civ. A. No. 2067.

United States District Court
D. Delaware.

June 15, 1962.

David Snellenburg, II, of Killoran & Van Brunt, Wilmington, Del., for plaintiff.

Ernest S. Wilson, Jr., and William T. Lynam, III, Wilmington, Del., for defendant American Luggage Works, Inc.

Henry M. Canby, of Richards, Layton & Finger, Wilmington, Del., and Robert W. Sayre, of Saul, Ewing, Remick & Saul, Philadelphia, Pa., for defendant John Wanamaker Philadelphia, Inc.

William S. Megonigal, Jr., of Morris, Nichols, Arsht & Tunnell, Wilmington, Del., Miles W. Kirkpatrick, Russell C. Dilks and Arthur R. Littleton, of Morgan, Lewis & Bockius, Philadelphia, Pa., for defendant Strawbridge & Clothier.

CALEB M. WRIGHT, Chief Judge.

This is a private antitrust action. Plaintiff, Philip Klein is a citizen of Delaware, operating two retail sales outlets in the vicinity of Wilmington, Delaware, under the name Phil's Distributors. One of these is within Wilmington, the other beyond the city limits.[1] Defendant, American Luggage Works, Inc. (hereinafter termed the manufacturer or American), is a Rhode Island corporation engaged in the manufacture and sale of luggage in interstate commerce; this activity includes sale of its products directly to retail outlets for resale to consumers. Defendants, John Wanamaker Philadelphia, Inc. (hereinafter Wanamaker) and Strawbridge & Clothier (hereinafter Strawbridge or S & C), Pennsylvania corporations, also engage in retail selling in the Wilmington area; each have a branch outlet beyond the city limits.

Claims for relief asserted in the complaint are based on the antitrust laws [2] and upon State law. The complaint contains a plethora of allegations which virtually exhaust all possible permutations and combinations of conspiracy between the named defendants. In each instance the object of the conspiracy, assailed as violative of the antitrust laws, is alleged to be a resale price maintenance scheme implemented by the sanction of defendant manufacturer's refusal to deal. The causes of action arising under State law consist of a claimed breach of an alleged requirements contract by American, and allegations that Wanamaker and Strawbridge, respectively, tortiously interfered with a contractual or business relationship between plaintiff and American. Plaintiff seeks threefold damages, injunctive relief, costs and reasonable attorneys fees for the alleged antitrust violations.[3] Actual and punitive damages are sought in connection with the tort claims; actual damages and specific performance are requested on the contract claims arising under State law. Plaintiff waived trial by jury. Defendants answered individually; each denied the applicable allegations of conspiracy, breach of contract, and tort. Each defendant asserted the affirmative defenses that the complaint failed to state a claim upon which relief can be granted, that the asserted causes were barred in whole or in part by the applicable statute of limitations, and that plaintiff was estopped from asserting the cause sounding in contract by virtue of a previous judgment rendered by the Superior

---

1. At time of trial Klein had three retail outlets. The latest addition is located in Dover, Delaware (N.T. 5).

2. 15 U.S.C.A. §§ 1–15, 26.

3. 15 U.S.C.A. §§ 15, 26.

Court of Delaware and affirmed by the State Supreme Court. Defendant American pleaded as an additional affirmative defense that the alleged contract was violative of the statute of frauds. Jurisdiction over the antitrust claims is conferred by 15 U.S.C.A. §§ 15 and 26, and § 1337 of the Judicial Code, 28 U.S.C.A. § 1337. Jurisdiction over the causes based upon State law is predicated upon complete diversity of citizenship between plaintiff and defendants coupled with the requisite amount in controversy.[4]

Plaintiff Klein is a discount merchant; Wanamaker and S & C are department stores. The Wilmington area branch outlets of S & C and Wanamaker, and Klein's suburban store, were nonexistent in the Spring of 1949 when American commenced to supply Klein with its luggage products. At that time the American salesman assigned exclusively to the territory comprised generally of the Middle Atlantic States, one Forman, visited Klein's store. Forman succeeded in opening an account; Klein agreed to sell the American product line. The details of the agreement are in dispute. In the course of testimony Klein referred to the arrangement as a "requirements contract" and as an "exclusive dealership".[5] The question of the legal correctness of these labels aside, it is probable Klein understood American undertook to supply him perpetually with whatever quantities of the product line he required. American Luggage, on the other hand, viewed the quantities shipped to Klein as a series of individually consummated sales. The existence of any requirements contract or exclusive dealership is denied.[6]

Whatever the nature of the relationship between Klein and American, it continued from the Spring of 1949 to January 23, 1956. The Wanamaker branch outlet in suburban Wilmington opened in November of 1950, and the similarly situated Strawbridge branch opened in October of 1952. During this same period—the record fails to reveal precisely when—Klein opened his suburban store. The Strawbridge outlet has continuously marketed American products since its inception. The Wanamaker branch has done likewise with the exception of a period from August, 1954 to August, 1955, when supply from American was discontinued. Both Klein outlets dealt in the American line until January of 1956. Klein believed the territorial scope of his exclusive dealership was confined to the area within the Wilmington city limits. He consequently registered no protest concerning the availability of American products in the Wanamaker and Strawbridge suburban stores.

It was the established practice of American to specify resale prices of the various items supplied to retailers. Two distinct methods were employed to apprise the dealer of these specified price levels. Upon solicitation of new accounts, American sales representatives showed catalogues containing suggested resale prices to the prospective retailer for his inspection. The second and most important means of communicating suggested resale prices to retailers was the "preticketing" method: attached to each item manufactured by American was a tag containing the suggested retail price of the article. The tags were appended by the manufacturer before shipment to

---

**4.** 28 U.S.C.A. § 1332; Strawbridge v. Curtiss, 3 Cranch 267, 7 U.S. 267, 2 L.Ed. 435 (1806).

**5.** Klein testified that he agreed to market American products in a concentrated sales campaign, and hence merchandising considerations necessitated display of the complete line. This would in turn require displacement of some of the lines in competition with American from Klein's displays. Klein testified that in view of this

business requirement, he suggested an exclusive dealership; he further testified that Forman acceded to this request.

**6.** American's President testified that the corporation has never granted an exclusive dealership to any retailer, that corporate policy forbade such commitments, and that it was not the American practice to confine distribution to one retail outlet in a community the size of Wilmington.

any retailer. Prices appearing on the tags were identical to those contained in the catalogues shown to the dealers by sales representatives when accounts were first solicited.

The focal point of the conspiracy allegations is American's resort to the method of preticketing to suggest retail prices coupled with the sanction of refusal to deal. It was the policy of the manufacturer at all times pertinent to this lawsuit to restrict supply of its luggage articles to retail dealers willing to respect the suggested prices. As a general rule, this policy was explained to a prospective dealer at the inception of a new account by the American sales representative; the dealer was presented with a catalogue of list prices and informed that full compliance with the preticketed price was mandatory; in the event the retailer voiced an intention to disregard the preticketed prices, supply was denied. Articles produced by American were not Fair Traded; indeed, the manufacturer's Vice President in charge of sales expressly testified that the personal contact afforded by the system of solicitation hereinbefore described was of greater effectiveness in securing adherence to suggested retail prices than resort to Fair Trade agreements. No formal method of policing adherence to the suggested prices apparently existed. Instances of deviation were usually brought to the attention of American executives through channels not clear from the record. Upon receipt of a complaint or other notice of noncompliance on the part of a retailer, a prompt investigation for purposes of verification was undertaken, usually by sales representatives of the manufacturer. Failure to adhere to preticketed prices resulted in cessation of the offending dealer's supply.

In the formulation of preticketed prices for items in the American product line, the needs of department stores were explicitly considered. Prices established were geared to the larger profit margins required by such outlets and contained retail profit components designed to meet these needs. In view of the constrained dynamics of price formation operative in the situation, the executives of American expressly disavowed that any sales representative ever impressed upon defendants Strawbridge and Wanamaker the necessity of adherence to preticketed prices, since compliance on the part of department stores was automatically assured by virtue of their profit margin requirements. This disavowal was largely corroborated by a buyer of Wanamaker, who testified that while there was never a discussion between himself and any American personnel concerning the resale price, the preticketed prices reflected the "normal" mark-up. Wanamaker adhered to the suggested prices. This same buyer assumed that the luggage supplied Strawbridge was preticketed and further assumed that S & C complied with the suggested prices.[7] Other evidence in the record shows both assumptions were well-founded.[8]

Notwithstanding express instructions to refrain from selling to price-cutters, Forman established the Klein account in 1949 with strong suspicion of the latter's discount activities. The ensuing years witnessed the advent of the Wilmington branch outlets of Strawbridge and Wanamaker. Concurrently, Klein was repeatedly admonished by Forman to maintain the preticketed price levels. Klein ignored Forman's importunities, and continued to retail American luggage products at discount rates. Forman's apprehension over the matter stemmed largely from complaints or queries made from time to time by Wanamaker and

7. Defendant Strawbridge & Clothier presented no case-in-chief in support of its defense to this action, interposing in lieu thereof a motion for involuntary dismissal under Rule 41(b) of the Federal Rules of Civil Procedure, 28 U.S.C.A.

8. Plaintiff Klein and his agents regularly shopped the Wanamaker and Strawbridge stores in the Wilmington area. Both outlets were observed to sell preticketed American luggage at the specified price levels.

S & C sales personnel in other Wilmington and Philadelphia stores. Sales clerks voiced complaints concerning representations received from potential customers to the effect that American luggage was available elsewhere in Wilmington at prices below the preticketed levels. A Strawbridge buyer in Philadelphia made a similar inquiry of Forman, and a Wanamaker buyer, Leahy, threatened to take unspecified action if American persisted in selling to discounters.[9] None of these complaints or comments made reference to any specific merchant, but Forman knew that the remarks could pertain only to Klein, since the latter was the sole discounter in the Wilmington area handling American luggage. Comments similar to those received by Forman reached the executives of American.[10] In the course of returning to Rhode Island from a social event held in Baltimore, Sol Koffler, American President, and Herman Koffler, American Vice President in charge of sales, visited Wilmington in early January of 1956. Though Wilmington was reputed to be a price cutting area, the purported purpose of the Koffler stopover was not to seek out price cutters, but rather to survey existing retailers there in an effort to ascertain whether the most desirable outlets were utilized in marketing the luggage. In the course of this informal survey, it was learned that American luggage was available only at Klein's.[11] Klein's display of the American line was found unattractive, and his discounting activities were discovered.

Approximately one week later, President Koffler ordered a letter dispatched to Klein containing notice of complete cessation of supply of American luggage products.[12]

The Strawbridge outlet in the Wilmington area dealt in American luggage products continuously since its inception in 1952. The Wanamaker stores marketed American products until August, 1954, at which time the manufacturer notified Wanamaker its supply of luggage would be discontinued.[13] Pertinent events preceding the Wanamaker termination were as follows: the responsibility and control of purchasing supplies of luggage from the various luggage manufacturers for resale in the Wanamaker outlets, including the Wilmington branch, were entrusted to the luggage buyer in the Wanamaker central offices at Philadelphia.[14] Prior to February, 1953, William Leahy was the Wanamaker buyer. For reasons not altogether clear from the record, Leahy decided to discontinue sales of American luggage, and had virtually completed the process of closing out existing American stock in inventory when he was succeeded as buyer by Nathaniel Cartmell. Wanamaker generally placed no orders with American during the balance of 1953, except possibly for small fill-in orders for particular patterns previously sold. Late in 1953 or in early 1954, American brought forth a new line of luggage called the Tri-Taper series. The Tri-Taper models were unique in appear-

9. See notes 79–80, infra, and accompanying text.

10. American's Vice President in charge of sales, Herman M. Koffler, did not recall the source of the comment; he emphatically denied that any such complaint or comment was ever received from anyone in the employ of Wanamaker. Forman conceded that he may have reported the protests of the sales clerks to his superiors, making but oblique reference to a nameless Wilmington price cutter in the course of his disclosure.

11. The Kofflers' visit was confined to downtown Wilmington. The record elsewhere indicates that Klein was the sole retailer handling American luggage within the Wilmington city limits.

12. See PX 1.

13. See Defendant Wanamaker Exhibits 1 through 4.

14. Strawbridge's purchase of luggage and distribution to branch outlets was similarly centralized in its main offices in Philadelphia. As with Wanamaker, these purchases were negotiated by a luggage buyer located in these offices.

ance and distinctively styled; [15] the record leaves little doubt but that the new series enjoyed rapid and overwhelming commercial success. By 1956 American luggage had achieved national prominence. In the Spring of 1954, Cartmell ordered some three dozen pieces of the Tri-Taper line to be sold principally at the Philadelphia store, though displays consisting of less than the full range of items available were also shown in the Wanamaker branch outlets. Difficulty with lining separation and defective locks plagued the early Tri-Taper models, however, and Cartmell returned a batch of the defective pieces to the manufacturer, simultaneously cancelling future orders until such time as he could be certain the defects of manufacture were remedied.[16] In view of the past history of general lack of enthusiasm for the American line exhibited by Wanamaker during the successive tenures of Leahy and Cartmell as buyers, American declined to deal further with Wanamaker on such a limited basis.[17] Wanamaker dispensed with merchandising American products until Mongiven, Cartmell's successor as buyer, placed an order for additional items in the Tri-Taper series in July, 1955. This order was accepted by the manufacturer. Since then, American has supplied Wanamaker with its luggage products continuously.

American Luggage notified Klein of its refusal to deal some four months subsequent to the time supply of Wanamaker was resumed. Sales representative Forman was ignorant of the Kofflers' trip to Wilmington which precipitated termination of the Klein account. Klein was likewise unaware of the reasons underlying the notice of refusal to deal and requested Forman make inquiries. After consulting his superiors, Forman informed Klein that supply was discontinued because of discovery of the latter's discounting activities. Shortly thereafter, a conference between Klein and executives of America took place in New York City during a formal showing of the products of the manufacturer. In the course of this meeting, American President Sol Koffler informed Klein that resumption and continuation of his account was conditional upon adherence to preticketed prices. Klein refused to accede to such an arrangement, whence Koffler declined to reactivate the account.

As a consequence of being permanently denied supply of the American product line, Klein was deprived of the opportunity to reap anticipated future profits which would have resulted from continued sale of the luggage. Plaintiff introduced evidence of profits derived from the sale of American luggage in previous years; the court is requested to ascertain the magnitude of lost future profits by extrapolation from this data.[18] The permanent denial of supply also created an urgent need for prompt substitution of a competitive luggage line; plaintiff was thus constrained to dispose hastily of existing American products in inventory in order to stock the substitute line. The disposition was accomplished at a loss for which plaintiff seeks compensation.[19] Plaintiff seeks

15. Various components of the Tri-Taper series were the subjects of patents: the method of molding the shell case was the subject of a process patent; the closure and lockfittings were covered by mechanical patents.

16. See Defendant Wanamaker Exhibit No. 1.

17. See Defendant Wanamaker Exhibit No. 4.

18. See notes 85 and 87, infra, and text thereto.

19. Klein elaborated on the reasons for the prompt disposition of American articles remaining in inventory; customers generally purchase items in a line of luggage on a piecemeal basis; consumer acquisition of a complete set therefore required several purchases over an extended period of time. Denied further supply of American luggage, Klein could no longer assure customers that items supplementing an American line would be available for future purchase. Prompt disposal of remaining American articles was therefore

as damages threefold the total amount of the two categories of losses.

Two questions may be resolved conveniently at the outset: 1) whether any causes or issues concerning the various parties in the present controversy were conclusively determined by the judgment previously rendered in the State Court; and 2) whether the applicable statute of limitations precludes the introduction of certain evidence.

**1) *The Previous Judgment of the State Court***

On August 14, 1956, American brought suit against Klein for goods sold and delivered. Klein admitted sale and delivery, but alleged the goods were deficient in quality; he also counterclaimed for breach of an alleged exclusive dealership agreement.[20] Judgment was rendered for plaintiff American in that action, but a motion for new trial was granted. The cause was retried on November 17, 1958. In this second proceeding, defendant Klein was permitted to interpose another counterclaim for damages resulting from breach of an alleged requirements contract. The Superior Court directed a verdict for plaintiff American on the ground that Klein's notice of his intention to hold American liable in damages for breach of the requirements contract was insufficient; Klein's subsequent motion for new trial

was denied. The Supreme Court of Delaware affirmed the judgment, holding Klein's notice to American of the breach of the alleged requirements contract deficient, and the counterclaim for damages therefore precluded.[21]

This court is mindful that the requirements of the legislative implementation of the full faith and credit cause of the Federal Constitution compel that the judgment previously rendered by the State Court be here accorded " * * * the same full faith and credit * * * [as it would have] * * * by law or usage in the courts * * * [of Delaware] * * *."[22] Since jurisdiction over the claims arising under State law is grounded upon diversity of citizenship, an identical approach obtains under the doctrine of Erie R. Co. v. Tompkins.[23] The problem of whether the prior judgment concludes the parties as to any causes or issues in the present controversy is therefore determined by resort to the principles of res judicata and collateral estoppel, as developed and applied by Delaware tribunals.[24]

Some semantic confusion must first be dispelled. Professor Moore defines res judicata as that principle which gives conclusive finality to a final, valid judgment on the merits, thereby precluding " * * * further litigation of the *same* cause of action between

---

necessary to prepare for the institution of a complete range of a competitive line.

20. American Luggage Works, Inc. v. Klein, Civil Action No. 808, Superior Court of the State of Delaware, in and for New Castle County, 1956.

21. Klein v. American Luggage Works, Inc., 158 A.2d 814 (Sup.Ct.Del.1960). The precise holding was that Klein failed to give notice as required by § 49 of the Uniform Sales Act, 6 Del.Code 1953, § 749, which provides:
"In the absence of express or implied agreement of the parties, acceptance of the goods by the buyer shall not discharge the seller from *liability in damages or other legal remedy* for the breach of any promise or warranty in the contract to sell or the sale. But, if, after acceptance of the goods, the buyer fail to give notice

to the seller of the breach of any promise or warranty within a reasonable time after the buyer knows, or ought to know of such breach, the seller shall not be liable therefor." (Emphasis supplied.)

22. 28 U.S.C.A. § 1738. See also American Surety Co. v. Baldwin, 287 U.S. 156, at 166, 53 S.Ct. 98, at 101, 77 L.Ed. 231 (1932).

23. 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938). Should the previous judgment bar reassertion of the contractual claims in Delaware tribunals, such a result would be binding upon this court, as it clearly affects the outcome of the litigation. Guaranty Trust Co. of New York v. York, 326 U.S. 99, 65 S.Ct. 1464, 89 L.Ed. 2079 (1945).

24. See generally 1A Moore's Federal Practice, 4017–4023, ¶ 0.401, 2nd Ed. (1961).

the same parties \* \* \* [or those in privity with them] \* \* \*." [25] Collateral estoppel is defined by Professor Moore as the doctrine whereby " \* \* \* material matters \* \* \* adjudged are binding upon the parties and their privies in subsequent litigation \* \* \* ", even though the second cause of action differs from the first.[26] The Delaware Courts apply the same substantive principles. The older cases exhibited a tendency to include both under the category of res judicata; more recent decisions distinguish the two concepts.[27] The distinction is purely one of labels. For present purposes, this court will adopt Professor Moore's terminology. It is clear from the Delaware case law that the previous judgment works to preclude Klein from asserting against American any claim arising out of the alleged requirements contract in the Delaware Superior Court. He was afforded full opportunity to litigate any contractual claim arising out of the subject matter of the previous litigation, which would be cognizable by the Superior Court,[28] and may not now assert these in this court.

■■ This would be the end of the matter, were it not that Delaware still maintains separate courts of law and equity at the trial level. Plaintiff seeks specific performance of the alleged requirements contract. It remains to be explored, therefore, whether the Superior Court judgment would bar access to the Delaware Court of Chancery for this traditionally equitable relief. Assuming arguendo, that resort to the Court of Chancery for specific performance would be available in the absence of the previous Superior Court judgment, it seems clear that in the present situation, the Chancellor would apply the principle of collateral estoppel to deny equitable relief to Klein;[29] the previously deter-

---

25. Id. at pp. 4017–4018 (emphasis contained in treatise).

26. Id. at pp. 4018–4019.

27. Compare Ajax Rubber Co. v. Gam, 3 W. W.Harr. 73, 33 Del. 73, 130 A. 395 (1925) and Powell v. Powell, 12 Del.Ch. 169, 109 A. 1 (1920), with Bata v. Bata, wherein the distinction is termed "quite useful", 163 A.2d 493, 504 (Sup.Ct.Del.1960). (Citations are representative rather than exhaustive.)

28. As to the cause of action in issue in the previous litigation, viz., damages for breach of requirements contract, the previous judgment is conclusive by application of res judicata. See Ajax Rubber Co. v. Gam, note 27, supra. The principle of res judicata likewise precludes Klein from presently asserting additional claims cognizable by the Superior Court and arising out of the same subject matter, because these should have been litigated in the previous State action. See Ajax Rubber Co. v. Gam, and Powell v. Powell, note 27, supra.

 This result is reinforced by the thrust of the Rules of Procedure of the Superior Court, which are designed to prevent piecemeal litigation. Rule 13(a) of the State tribunal (Compulsory Counterclaims), Del.C.Ann. is identical in terms to Rule 13(a) of the Federal Rules of Civil Procedure. " \* \* \* While not accepted as conclusive, the construction of the Rules by the Federal judiciary is of 'great persuasive weight' in the construction of the Delaware Rules. \* \* \* " Herrmann, The New Rules of Procedure in Delaware, 18 F.R.D. 327, 341, and cases cited at footnote 23 (1955). The great weight of authority among federal courts is to the effect that Federal Rule 13(a) embodies the principle of res judicata, whence any issue which should have been raised, albeit actually omitted, is concluded between the parties to the previous litigation. See 3 Moore's Federal Practice, 27 et seq., ¶ 13.12 (2nd Ed. 1960) and cases cited therein. It would seem, therefore, that Delaware would construe Superior Court Rule 13(a) likewise, with the result that further resort by Klein to that tribunal, in connection with the same subject matter, is precluded by the previous judgment.

29. The wording of the Statute, note 21, supra, restricts the requirement of notice within reasonable time to situations wherein the buyer seeks legal, rather than equitable, relief for breach of warranty. This is largely a result of historical accident, for the purpose of the provision is " \* \* \* to ameliorate the harshness of the *common law rule* that mere acceptance on the part of the buyer of title to the property in question constituted a waiver for a breach of warranty

mined insufficient notice would be conclusive in the proceeding in the Court of Chancery.[30]

The judgment previously rendered is conclusive between Klein and American as to all claims based upon the alleged contract. Delaware restricts the binding effect of such judgments to the parties to the previous litigation and their privies.[31] Wanamaker and Strawbridge were not parties to the previous litigation, nor do they presently stand in privity with the parties in that proceeding. Klein is therefore not precluded from proving the existence of a contract with American in connection with his causes in tort against Wanamaker and S & C. Nor does the previous judgment conclude the antitrust claims presently asserted; jurisdiction over such matters is entrusted exclusively to Federal District Courts.[32]

## 2) *The Statute of Limitations and Admissibility of Evidence*

With respect to certain evidence sought to be introduced by plaintiff and provisionally admitted by the court, defendants have advanced the following objection: the statute of limitations applicable to this controversy is four years;[33] therefore, evidence of activities which occurred more than four years prior to commencement of the action is inadmissible. Defendants rely on Klein v. Lionel Corp., 130 F.Supp. 725 (D.C.Del.1955)[34] as authority for this proposition. This court is of the opinion that defendants' reliance is misplaced. Klein v. Lionel did no more than apply the period of limitations in accordance with well established principles to bar all claims wherein the period of

* * *", Klein v. American Luggage, note 21, supra, 158 A.2d at p. 817 (emphasis supplied). Concurrently the seller is statutorily afforded " * * * protection against stale claims by requiring prompt notice of such claim * * *". Id. This latter objective is identical to that most often advanced as the underlying principle of statutes of limitations. The statute presently under consideration utilizes a flexible test of notice within reasonable time in lieu of an arbitrary fixed period of limitations. Because of the similarity in this respect to an orthodox statute of limitations, this court is of the opinion that the Delaware Chancery would give it full force and effect when equitable relief from a breach of warranty is sought by a purchaser with title to the goods. It should be noted that jurisdiction of law and equity are concurrent in the present situation. In such instances, the Chancellor employs the analogous statute of limitations at law to determine whether complainant has been guilty of unreasonable and prejudicial delay in instituting suit. Bovay v. H. M. Byllesby & Co., 26 Del. Ch. 69, 22 A.2d 138, 142 (1941); Wright v. Scotton, 13 Del.Ch. 402, 121 A. 69, 73, 31 A.L.R. 1162 (Del.1923); and see the dictum in Hutchinson v. Fish Engineering Corp., 153 A.2d 594, 597 (Del. Ch. 1959). The interests of uniform substantive regulation and harmony between the State Courts of Chancery and law further compel this result. Once a determination is made that the. Chancellor would generally apply the requirements of notice within reasonable time as contained in 6 Del.Code 1953, § 749, it suffices to observe that this matter was conclusively determined adversely to Klein in the previous action at law.

30. E. g., Venetsanos v. Pappas, 21 Del.Ch. 177, 184 A. 489 (1936). Chancellor Wolcott there observed that " * * * [a] * * * former adjudication is equally effective as an estoppel whether it be a judgment at law or a decree in equity. * * *" 184 A. at 490.

31. E. g.: Powell v. Powell, note 27, supra.

32. E. g.: Freeman v. Bee Machine Co., 319 U.S. 448, at 451, note 6, 63 S.Ct. 1146, 87 L.Ed. 1509 (1943).

33. 15 U.S.C.A. § 15b.

34. At the time of this proceeding the applicable period of limitations was three years. This court held, per Rodney, J., that the portion of a sequence of alleged violations of the Robinson-Patman Price Discrimination Act which occurred more than three years prior to commencement of the action could not serve as a basis of recovery. It was further decided that " * * * interrogatories inquiring of events prior to that time need not be answered * * *", since such matters were neither in issue nor of any bearing upon issues to be litigated. 130 F.Supp. at 728.

limitations had run.[35] Defendants here seek to employ the applicable statute of limitations as a rule governing the admissibility of evidence. No such import obtains from the provision. Once a determination is made that assertion of the claim is not barred, questions concerning admissibility of evidence are resolved by resort to rules wholly separate from the statute of limitations. In this connection, the formative stages and details of the agreement comprising the alleged conspiracy may long antedate the conduct pursuant thereto which results in the alleged invasion of plaintiff's rights. Evidence pertaining to such matters is admissible.[36] The court therefore overrules the evidential objections predicated upon the statute of limitations.

With the resolution of these preliminary procedural problems, it remains to consider the merits of the controversy.

 Successful prosecution of a private antitrust suit requires a showing that defendants violated the antitrust laws. In the case at bar, defendants' conduct is alleged to fall within the prohibitions of the Sherman Act.[37] Violation of the Sherman Act is but one necessary element of plaintiff's case—it must further be demonstrated that plaintiff's business or property suffered a uniquely personal pecuniary injury which proximately resulted from the unlawful activities of defendants.[38] Defendants con-

35. As to each of the series of violations there alleged, the statutory period began to run when the right of action accrued. Judge Rodney then observed that no circumstances were present which would toll the running of the period, when any cause not asserted before the period ran to completion was forever barred. Moreover, each violation created an independent and distinct claim, whence causes barred by the period of limitation were of no relevance or materiality to those yet actionable.

36. In civil conspiracy, the right of action accrues when plaintiff's rights are invaded as a result of the conspiracy. Williamson v. Columbia Gas & Electric Corp., 186 F.2d 464, 469 (3 Cir. 1950). In the case at bar, suit was commenced December 5, 1958. The earliest arguable invasion of plaintiff's rights—and hence the earliest possible accrual of the cause asserted—took place circa January 23, 1956, when Klein was notified of American's refusal to deal. Suit was therefore brought well within the applicable four year period of limitations. But plaintiff must also establish a conspiracy in violation of the antitrust laws and further demonstrate a proximate causal connection between the unlawful combination and the injury suffered. See Kessler and Stern, Competition, Contract, and Vertical Integration, 69 Yale L.J. 1, 82–83 (1959) and materials cited; see also note 38, infra, and accompanying text. In view of the four year period of limitations and the date the present suit was begun, evidence of activities which occurred more than four years prior to December 5, 1958,

" * * * may be introduced *as evidence of the existing conspiracy, but may not be the basis of a cause of action upon which plaintiffs* may recover. * * * " Dovberg v. Dow Chemical Co., 195 F.Supp. 337, 343 (D.C.E.D.Pa. 1961). (Emphasis contained in original opinion.)

See also Dipson Theatres, Inc. v. Buffalo Theatres Inc., et al., 8 F.R.D. 86, 89 (D.C.W.D.N.Y.1948); Johnson v. J. H. Yost Lumber Co., 117 F.2d 53, 60 (8 Cir. 1941).

37. 15 U.S.C.A. §§ 1 and 2.

38. The alleged invasion of plaintiff's proprietary rights must entail more than the harm suffered by the public generally. Thus plaintiff may not sue on behalf of the public; authority to prosecute civil actions in vindication of the public interest is conferred exclusively upon the " * * * several district attorneys, of the United States * * * under the direction of the Attorney General * * *." 15 U.S.C.A. § 4. Judge Rodney previously articulated these principles on behalf of this court in Tivoli Realty, Inc. v. Paramount Pictures, Inc., D.C., 80 F. Supp. 800, 805–806 (1948). That this is the established construction placed upon the provisions of the antitrust laws authorizing private parties to bring suit for treble damages and injunctive relief, 15 U.S.C.A. §§ 15 and 26 (Clayton Act, §§ 4 and 16), respectively, is borne out by a vast array of case law. See Kessler and Sharp, note 36, supra, and materials cited; an extensive collection of cases may be found in Timberlake, The Legal Injury Requirements and Proof of Damages in Treble Damage Actions Un-

tend that the evidence adduced at trial fails to disclose a violation of the Sherman Act. Defendants Wanamaker and Strawbridge additionally contend that even assuming an unlawful conspiracy in restraint of trade has been amply demonstrated, the admissible evidence fails to implicate them as parties to the combination. Lastly, all defendants assert plaintiff's case to be fatally defective in that the attempt to show pecuniary injury resulting from the alleged violation has been thwarted by complete failure of proof.

For the reasons set forth hereinafter, the court is of the opinion that plaintiff has successfully established a violation of the Sherman Act and made sufficient showing of injury resultant therefrom to entitle him to damages and injunctive relief. Accordingly, the antitrust violation will first be analyzed, whereupon the court will proceed to evaluate the evidence of damage.

### The Sherman Act Violation

In its broadest aspects, this case presents another situation illustrative of the conceptual and practical difficulties encountered in attempts to reconcile United States v. Colgate & Co., [39] with related Supreme Court pronouncements. The most recent opinion by the Court in this connection is United States v. Parke, Davis and Co.,[40] which contains a painstaking examination and clarification of past precedents. This court is of the opinion that the principles found in Parke, Davis—including interpretations of the prior case law—are dispositive of the case at bar.

The Colgate doctrine simply embodies:
" * * * [T]he long recognized right of trader or manufacturer engaged in an entirely private business, freely to exercise his own independent discretion as to parties with whom he will deal. And, of course, he may announce in advance the circumstances under which he will refuse to sell. * * * " [41]

" * * * In the absence of any purpose to create or maintain a monopoly * * *," [42] the Sherman Act does not encroach upon this right. The conceptual difficulty which inheres in this seemingly forthright line drawing process is the element of agreement which attends a seller's adherence to a manufacturer's schedule of resale prices. In the face of an advance announcement by the manufacturer that price cutters will be denied supply, a seller's compliance with prices suggested strongly infers a tacit or implied resale price maintenance agreement. The inference of agreement is no less present where the seller's acquiescence to prices suggested manifests a

---

der the Anti-trust Laws, 30 Geo.Wash. L.Rev. 231, 232 et seq. (1961).

39. 250 U.S. 300, 39 S.Ct. 465, 63 L.Ed. 992 (1919).

40. 362 U.S. 29, 80 S.Ct. 503, 4 L.Ed.2d 505 (1960).

41. United States v. Colgate & Co., 250 U.S. 300, 307, 39 S.Ct. 465, 468, 63 L.Ed. 992 (1919), quoted verbatim in United States v. Parke, Davis & Co., 362 U.S. 29 at 37, 80 S.Ct. 503, at 508, 4 L.Ed.2d 505.

42. Ibid. § 1 of the Sherman Act forbids:
"Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations * * *." (15 U.S.C.A. § 1).
Section 2 of the Act provides that:
"Every person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States, or with foreign nations, shall be deemed guilty of a misdemeanor * * *." (15 U.S.C.A. § 2).
As the foregoing quotation in the text indicates, the common law right of a trader to deal with others on terms of his own choosing was never thought to protect conduct violative of § 2, i. e., attempts to monopolize or entrenchment of a monopolistic position. The task confronting the judiciary in these cases was therefore one of delimiting the scope of the right of refusal to deal on the one hand, and violations of § 1 of the Act on the other. See footnote 1 of the dissenting opinion of Mr. Justice Harlan in Parke, Davis, 362 U.S. at p. 50, 80 S.Ct. 503, 4 L.Ed.2d 505.

response to whatever inducements or coercive pressures result from the prior announcement and the consequent threatened deprivation of the line of goods in the event of non-compliance.[43] But for the protection afforded by the Colgate refinement of the common law right of traders to exercise the utmost discretion in business affairs, adherence by retailers to suggested prices, prompted by previously announced conditions of refusal to deal, would in all likelihood result in a finding of underlying agreements to fix prices, and consequently run afoul of § 1 of Sherman.[44]

From a practical point of view, assuming lawful resort to the sanction of refusal to deal and consequent collective adherence by dealers to the prices specified, the resulting economic restraint is functionally indistinguishable from the anticompetitive situation which arises from a purely horizontal price fixing conspiracy among retailers—a trade restriction clearly in violation of the Sherman Act.[45]

The Supreme Court has long been aware of these troublesome aspects of the Colgate rule;[46] subsequent cases have steadily encroached upon the protection previously thought to be secured by the doctrine.[47] The most recent example of this restrictive trend is Parke, Davis; Colgate is therein interpreted to confine immunity from antitrust liability to sellers whose actions do not exceed " * * * a simple refusal to sell to customers who will not resell at stated prices * * *."[48] While the court in Parke, Davis declined to overrule Colgate,[49] judges and commentators alike have questioned whether the eroded doctrine of that case retains any meaningful substantive content.[50]

43. " * * * Surely, it would not mitigate the offense if adherence to the plan were involuntarily exacted * * *", Rifkind, J., in United States v. Bausch & Lomb Optical Co., 45 F.Supp. 387, 396 (D.C. S.D.N.Y.1942); in modifying the decree, the Supreme Court stated: " * * * whether this conspiracy and combination was achieved by agreement or by acquiescence of the wholesalers coupled with assistance in effectuating its purpose is immaterial, * * *" 321 U.S. 707, 723, 64 S.Ct. 805, 813, 88 L.Ed. 1024 (1944). See also Flintkote Co. v. Lysfjord, 246 F. 2d 368, 375 (9 Cir. 1957) (coerced participation in an illegal scheme does not excuse the actor).

44. Compare Dr. Miles Medical Co. v. John D. Park & Sons Co., 220 U.S. 373, 31 S.Ct. 376, 55 L.Ed. 502 (1911) (Written Contracts); the majority in Parke, Davis indicated in a footnote that " * * * a price maintenance agreement, express, tacit or implied * * *" falls within the proscriptions of the Sherman Act, 362 U.S. at p. 45, footnote 6, 80 S.Ct. at 512.

45. E. g.: Dr. Miles Medical Co. v. John D. Park & Sons Co., 220 U.S. 373, 408–409, 31 S.Ct. 376, 55 L.Ed. 502 (1911).

46. This was again recognized in Parke, Davis:
" * * * The Sherman Act forbids combinations of traders to suppress competition. True, there results the same economic effect as is accomplished by a prohibited combination to suppress price competition if each customer, although induced to do so solely by a manufacturer's announced policy, independently decides to observe specified resale prices. So long as Colgate is not overruled, this result is tolerated but only when it is the consequence of a mere refusal to sell in the exercise of the manufacturer's right 'freely to exercise his own independent discretion as to parties with whom he will deal.' * * *" 362 U.S. at p. 44, 80 S.Ct. at p. 511.

47. A partial—perhaps complete—explanation for the erosion suffered by the Colgate rule is the long-standing judicial abhorrence of price fixing in any form, e. g.:
" ' * * * Under the Sherman Act a combination formed for the purpose and with the effect of raising, depressing, fixing, pegging, or stablizing the price of a commodity in interstate or foreign commerce is illegal per se.' * * *" Kiefer-Stewart Co. v. Joseph E. Seagram & Sons, 340 U.S. 211, 213, 71 S.Ct. 259, 260, 95 L.Ed. 219 (1951) and citation.

48. 362 U.S. at 42, 80 S.Ct. at 511. See also note 46, supra.

49. Note 46, supra.

50. "Scrutiny of the * * * [majority] * * * opinion will reveal that the Court has done no less than send * * * [the Colgate doctrine] * * * to its

Attempts to effectuate price maintenance found in previous adjudications to fall without the limited protection of Colgate—and hence to contravene § 1 of Sherman—invariably involved methods which entailed more than a simple announcement to the effect that noncompliance with specified price levels would be met with a refusal to deal. The underlying theory of the antitrust offenses in these cases is one of combination or conspiracy. Resort by the manufacturer to affirmative conduct which oversteps the permissible bounds defined by Colgate induces concerted action among customers: " * * * The manufacturer is thus the organizer of a price-maintenance combination or conspiracy in violation of the Sherman Act. * * * "[51] This conclusion of illegality obtains because the manufacturer's resort to means beyond a prior announcement of terms sanctioned by a refusal to deal creates coercive pressures which are deemed as a matter of law to induce concert of action among adherent customers. The presence of these pressures belies the inference that compliance on the part of each customer stems from individual free choice motivated solely by desire for the product[52]—an explanation of customer conduct which the Supreme Court apparently believes more plausible when the manufacturer confines his price maintenance efforts to those permitted by Colgate. " * * * The

product then comes packaged in a competition-free wrapping * * * by virtue of concerted action induced by the manufacturer. * * * "[53]

It is thus clear that once the manufacturer's conduct exceeds the limits declared legally permissible by Colgate, as definitively clarified in Parke, Davis, a Sherman Act violation occurs. Plaintiff urges that precisely such a situation is disclosed by the record in the case at bar. Klein further argues in effect that this same evidence, when coupled with additional evidence of Wanamaker and Strawbridge adherence to preticketed prices with knowledge of the concerted retailer adherence contemplated in effectuation of the manufacturer's price maintenance policy,[54] constitutes a *prima facie* case of conspiracy in violation of the Sherman Act against the named defendants. In this connection, certain extra judicial declarations by agents and employees of some defendants are offered as admissions binding all three alleged conspirators.[55]

Implicit in plaintiff's argument is the proposition that a Sherman Act violation in the form of a price fixing conspiracy or combination induced by a manufacturer's conduct which exceeds the permissible bounds of Colgate results in the imposition of civil liability upon both the manufacturer and upon customers who adhered to specified prices

---

demise * * * ." (Mr. Justice Harlan dissenting in Parke, Davis, 362 U.S. at p. 49, 80 S.Ct. at p. 514). See also Turner, The Definition of Agreement Under the Sherman Act: Conscious Parallelism and Refusals to Deal, 75 Harv.L.Rev. 655, 685 (1962): " * * * [T]he significant practical point was that the Court almost invariably found in some way the necessary element of agreement. * * * "

51. United States v. Parke, Davis & Co., 362 U.S. at 47, 80 S.Ct. at 513.

52. Ibid. See also note 46, supra.

53. Ibid.

54. Counsel for plaintiff has adopted the descriptive term "conscious parallelism"

to describe the Wanamaker and Strawbridge observance of preticketed prices.

55. Plaintiff thus seeks to invoke the co-conspirator exception to the hearsay rule, which may be stated in its most general form as follows: any extra judicial utterance by one co-conspirator or his agents made in furtherance of the conspiracy and during its pendency is admissible against each co-conspirator, provided that a foundation is laid for its reception by independent proof of the conspiracy. See Levie, Hearsay and Conspiracy, 52 Mich.L.Rev. 1159, 1161 (1954); Developments in the Law—Criminal Conspiracy, 72 Harv.L.Rev. 920, 984 et seq. (1959).

with knowledge of the concerted nature of the scheme.[56] While the validity of this proposition is not altogether free from doubt, the court is of the opinion that it is a correct statement of the law. It is first appropriate to observe that this result is a logical extension of the theory of Sherman Act violations found in cases typified by Parke, Davis. The manufacturer found to have overstepped the bounds of Colgate has organized a price fixing combination or conspiracy because of the inevitable tendency of his methods to induce concerted action among his customers with the result that price competition between them is entirely eliminated.[57] Characterization of the offense as conspiracy or combination implies civil liability for the violation attaching to all engaged in the forbidden undertaking, including customers.[58] The somewhat rigid and mechanical aspects of this result are wholly consistent with the inflexible Sherman Act proscriptions against price fixing in any form.[59] The manufacturer's motive, no matter how benevolent, in engaging in a prohibited price fixing combination is irrelevant. It is difficult to perceive any reason why the motive of a customer participating in the manufacturer's price maintenance scheme with knowledge of its collective aspects should stand on a different footing than the manufacturer's motive and in some circumstances possibly negate the finding of liability which would otherwise ensue from the antitrust violation.[60]

Notwithstanding the refined analytical extensions of the Parke, Davis rationale and the broad Sherman Act proscriptions against price fixing lead to the conclusion that liability is imposed upon customers knowingly engaged in maintaining resale prices, it must in candor be recognized that the Supreme Court has never specifically passed upon the question.[61] While a portion of the dissent's criticism of the majority opinion in Parke, Davis was directed at the asserted failure of the Court to indicate in some fashion " * * * what the purported new standard is for establishing a 'contract, combination * * * or conspiracy'

56. In the context of this private antitrust suit, a finding of a Sherman Act violation therefore results in the imposition of joint and several liability for plaintiff's damages upon all three defendants. Defendants stand in a position closely analogous to that of negligent joint tort feasors. The tortious aspects of a private antitrust claim have often been recognized, e. g.: Hanover Shoe, Inc. v. United Shoe Machinery Corp., 185 F.Supp. 826, 829 (D.C.M.D.Pa.1960), affirmed per curiam 281 F.2d 481 (3 Cir. 1960).

57. Notes 51–53, supra, and accompanying text.

58. Adherence to resale prices induced or coerced by economic pressures applied by the manufacturer does not exculpate the guilty participant customers. See note 43, supra.

59. Note 47, supra.

60. Compare Turner, supra, note 50, at pp. 696–697.

61. Research fails to reveal any instance where the precise question has been before the Court. Dr. Miles, note 45, supra, involved an attempt to secure specific performance of written contracts, which the court declined to grant because the terms of the agreements contravened the policies of the Sherman Act. Colgate and Bausch & Lomb, op. cit. supra, were civil suits prosecuted by the government against the manufacturer—in such proceedings the justice department can secure only injunctive relief, and the competitive restrictions may be effectively enjoined by a decree against the manufacturer alone, forbidding excessive utilization of the refusal to deal. Similar considerations apply in the issuance of FTC cease and desist orders in proceedings such as Beech-Nut Packing Co. v. Federal Trade Commission, 257 U.S. 441, 42 S.Ct. 150, 66 L.Ed. 307 (1922). United States v. Schrader's Sons, Inc., 252 U.S. 85, 40 S.Ct. 251, 64 L.Ed. 471 (1920) was a criminal prosecution of the manufacturer alone; whether criminal liability might attach to participating customers is a question which need not be resolved in the present controversy. Lastly, Frey & Son, Inc. v. Cudahy Packing Co., 256 U.S. 208, 41 S.Ct. 451, 65 L.Ed. 892 (1921) was a treble damage action against the manufacturer exclusively; it suffices to observe that recovery may be had in such circumstances without joinder of all potentially liable joint tort feasors. See note 56, supra.

* * * ",[62] a line of Supreme Court decisions dealing with closely related situations suggests the correctness of the foregoing analysis by way of analogy. In Interstate Circuit, Inc. v. United States, 306 U.S. 208, 59 S.Ct. 467, 83 L.Ed. 610 (1939), a motion picture exhibitor prevailed upon a group of competitive film distributors to enter into agreements and licenses under which the distributors agreed to enforce minimum admission price requirements against subsequent licensee-exhibitors. Each distributor entered into a separate agreement with the exhibitor; the agreements were substantially identical in each instance. In dictum, the Supreme Court emphasized that agreement between the competitive distributors was not a necessary prerequisite to a finding of conspiracy:

> " * * * It was enough that, knowing that concerted action was contemplated and invited, the distributors gave their adherence to the scheme and participated in it. Each distributor was advised that the others were asked to participate; each knew that cooperation was essential to successful operation of the plan. They knew that the plan, if carried out, would result in a restraint of commerce, which, * * * [as subsequently analyzed in the opinion] * * * was unreasonable within the meaning of the Sherman Act * * *. " [63]

In United States v. Masonite Corp.,[64] an illegal price fixing combination was found to exist where a patentee entered a series of license agreements whereby makers of competitive products distributed the patented items at prices established by the patentee, even though each of the licensed distributors,

" * * * [A]cted independently of the others, negotiated only with Masonite, desired the agreement regardless of the action that might be taken by any of the others, did not require as a condition of its acceptance that Masonite make such an agreement with any of the others, and had no discussions with any of the others. It is not clear at what precise point of time each * * * became aware of the fact that its contract was not an isolated transaction but part of a larger arrangement. But it is clear that, as the arrangement continued, each became familiar with its purpose and scope. * * * " [65]

This was deemed sufficient basis for a finding of unlawful combination under the principles of Interstate Circuit.[66]

Evidential implications of the principles contained in Interstate Circuit and Masonite were articulated in the subsequent decision of United States v. United States Gypsum Co.: [67]

> " * * * We think that the industry-wide * * * [patent] * * * license agreements, entered into with knowledge on the part of licensor and licensees of the adherence of others, with the control over prices and methods of distribution through the agreements and bulletins, were sufficient to establish a *prima facie case of conspiracy*. Each licensee, * * * could not have failed to be aware of the intention of United States Gypsum and the other licensees to make the arrangements for licenses industry-wide. * * * " (Emphasis supplied.) [68]

In this same case, the principles of Interstate Circuit and Masonite were

---

62. 362 U.S. at 53, 80 S.Ct. at 516.

63. 306 U.S. at 226–227, 59 S.Ct. at 474.

64. 316 U.S. 265, 62 S.Ct. 1070, 86 L.Ed. 1461 (1942).

65. Id. at 275, 62 S.Ct. at 1076.

66. Notes 62–63, supra, and text thereto.

67. 333 U.S. 364, 68 S.Ct. 525, 92 L.Ed. 746 (1948).

68. Id. at 389, 68 S.Ct. at 539.

broadly applied to a combination containing but a minimal element of vertical agreement: the licensor was a competitor of the licensees, and manufacture of the patented items was performed by the latter, in contrast to the factual setting of Masonite. The broad application of the principle was indicated in conjunction with a discussion of evidential considerations:

"* * * One of the things * * * [Masonite and Interstate Circuit] * * * establish is the principle that when a group of competitors enters into a series of separate but similar agreements with competitors or others, a strong inference arises that such agreements are the result of concerted action. That inference is strengthened when contemporaneous declarations indicate that supposedly separate actions are part of a common plan. * * * " [69]

Masonite and Interstate Circuit involved price fixing combinations, as did the factual situations in the refusal to deal cases. All involved attempts of a party to control prices of commodities along subsequent links in a chain of distribution after its right, title, or interest in the commodities had passed in accordance with prevailing trade practices. The analogy to the Parke, Davis situation lacks perfection only because concerted action in Masonite, et al., was brought about by a series of substantially identical agreements, rather than induced or coerced by excessive utilization of the sanction of refusal to deal. But as the foregoing discussion indicates,[70] the result of the latter situation is tantamount to procurement of tacit uniform agreements to observe specified prices. The competitive restraint is the same, regardless of the means employed to achieve it. The conclusion is irresist-

able that customers participating in a forbidden price fixing scheme bottomed on sanctions exceeding those protected by Colgate, with knowledge of the concerted aspects of the scheme, run the risk of civil liability under the antitrust laws.

As U. S. Gypsum makes clear, it follows that plaintiff's position as to the quantum of proof which constitutes *prima facie* evidence of conspiracy is likewise correct.[71]

The presence or absence of a Sherman Act violation thus turns on resolution of the factual question of whether, in attempting to effectuate its price maintenance policy, the actions of American Luggage exceeded "* * * a simple refusal to sell to customers who will not resell at stated prices * *," [72] bearing in mind that it is permissible in this connection to "* *. * announce in advance the circumstances under which * * * [it] will * * * sell. * * * " [73] The focus is thus upon the means employed by the manufacturer. The court is of the opinion that the price maintenance scheme of American exceeded the limits of permissibility as defined by Colgate, and is therefore offensive to the Sherman Act. Moreover, the record plainly reveals that Wanamaker and Strawbridge complied with the prices established with knowledge that the American scheme required concerted retailer adherence for its effectiveness, thereby rendering these two retailers parties to the resultant unlawful conspiracy under the principles of Masonite and Interstate Circuit.

The methods employed by American went far beyond a simple prior announcement of its policy to refuse dealings with price cutters. In the great majority of negotiations for new accounts, sales representatives of the man-

---

69. Id. at 394; 68 S.Ct. at 541.

70. See notes 42–45, supra, and accompanying text.

71. See notes 54–55, supra, and accompanying text.

72. Note 48; supra, and accompanying text.

73. Note 41, supra, and text thereto.

ufacturer solicited from the prospective retailer express assurances that the preticketed prices would be observed.[74] Negotiations of substantially identical import were held in Parke, Davis to be violative of § 1 of the Sherman Act.[75] Moreover, where such efforts culminated in a promise by the retailer to comply with the preticketed rates, the result was an express oral price fixing agreement—a violation of § 1 of the Sherman Act in itself, apart from the elements of concerted activity created by the aggregation of the many identical assurances of this nature.[76] Even in those instances where in the course of negotiations the sales representative refrained from soliciting an express commitment from the retailer to uphold preticketed prices, the dealer was strongly advised of the manufacturer's price maintenance policy—he was deluged with literature which emphasized its importance to the manufacturer, and the mechanics and objectives of preticketing were carefully explained.[77] He was informed that noncompliance with the prices established would be met with the sanction of a refusal to deal. The thrust of these negotiations served to impart to the prospective retailer knowledge of the concerted and pervasive nature of the price maintenance policy. It was extremely unlikely that an account could be consummated without a tacit agreement by the retailer to comply with the suggested prices—disclosure of the manufacturer's policies and methods of their effectuation was accomplished in such a way as to render undertaking an account by the retailer tantamount to an implied promise to comply with preticketed prices. Reasonable men could not interpret the purport of the negotiations otherwise. The methods employed by American show conclusively that the limits of Colgate were exceeded in effectuating adherence to the preticketed prices, and induced a price fixing conspiracy or combination among retailers. The Sherman Act forbids such activity.[78]

The record indicates that no express agreement to maintain preticketed prices ever existed between American and either Strawbridge or Wanamaker. The court finds, however, that tacit understandings of crucial import between each defendant retailer on the one hand, and the manufacturer on the other, arose from the continued course of dealing between the parties. On the basis of implications derived from American's preticketing practices,[79] and from the conversations between the manufacturer's sales representative, Forman, and the respective buyers, each defendant retailer knew that the manufacturer expected compliance with the preticketed prices by itself and any other retailer marketing the products. Each tacitly consented to this arrangement and did in fact sell at the established prices. This conclusion is supported by the evidence of queries or comments voiced to Forman by the respective buyers of Wanamaker and Strawbridge—whose authority to make statements binding their corporate principals is unquestioned—concerning the suspected existence of a price cutter in the Wilmington area. The two department stores thus participated in the unlawful price fixing conspiracy organized by the manufacturer with full knowledge of its concerted nature at the retail level. Moreover, they volunteered assistance in the ascertainment of noncomplying dealers, and could only have done so with the expectation that appropriate sanctions would be imposed upon the offender. This activity on the part of Wanamaker and Strawbridge suffices

---

74. N.T. 149, 182–183, 200–201.

75. Op. cit. supra, at p. 942.

76. Note 44, supra.

77. N.T. 181, 274–275.

78. Notes 40–53, supra, and accompanying text.

79. The general problem of preticketing need not be resolved here. As the above textual discussion indicates, in the present factual setting it was an integral part of the unlawful price maintenance scheme. An abstract analysis of preticketing alone is therefore unnecessary to the disposition of this case.

to implicate each as two of an unknown number of co-conspirators in the unlawful price fixing combination organized by the manufacturer.

The court therefore concludes that the conduct of all three defendants violated the Sherman Act and proximately caused injury to plaintiff's business in the manner hereinbefore described.[80]

### Damages and Injunctive Relief

Plaintiff seeks recovery of damages for two categories of losses which allegedly resulted from defendants' violation of the Sherman Act: 1) deprivation of future profits which could be reasonably anticipated in the absence of cessation of supply pursuant to the unlawful refusal to deal; and 2) diminution in revenue from the forced sale of American luggage in inventory at the time notice of the refusal to deal was received.[81]

It seems settled that both categories of damages are compensable in the same private antitrust proceeding.[82] For recovery, plaintiff must prove the fact of damages and adduce evidence which suffices to enable the trier to fix their amount " * * * as a matter of just and reasonable inference, although the result be only approximate. * * *"[83] Under some circumstances, the same evidence which tends to establish the fact of damage also tends to show the amount. But where evidence of each may be distinct, once the fact of damage is shown, the onus of demonstrating the amount may be relaxed upon apprehension of evidential difficulties peculiar to the particular factual situation under scrutiny.[84]

The court finds that plaintiff has demonstrated with certainty that his business suffered damage as a proximate result of defendants' violation of the Sherman Act. Pursuant to the unlawful scheme, plaintiff's supply of American luggage was abruptly discontinued. It is not seriously disputed that plaintiff had traded profitably in this line of goods

80. Competition in sales of American luggage in the Wilmington area was between Wanamaker, Strawbridge, and plaintiff, exclusively. The thrust of past dealings between American and the respective defendant retailers was such as to make continued adherence to preticketed prices by Wanamaker and Strawbridge a certainty. Defendant American could thus safely refuse to deal with plaintiff with no attendant risk of market foreclosure in Wilmington. The court is therefore of the opinion that participation by Wanamaker and Strawbridge in the unlawful scheme was a vital link in the causal chain which terminated in plaintiff's cessation of supply. Compare William Goldman Theatres, Inc. v. Loew's, Inc., 150 F.2d 738 (3 Cir. 1945), 164 F.2d 1021 (3 Cir. 1948), cert. denied, 334 U.S. 811, 68 S.Ct. 1016, 92 L.Ed. 1742 (1948), a private antitrust proceeding where the principles of Interstate Circuit, op. cit. supra, were applied to find concerted action with an intent to monopolize and exclude plaintiff from competition in the exhibition of first-run Warner Bros. films in Philadelphia. Liability for the Sherman Act, § 2, offense was imposed upon participating producers, exhibitors, and licensors of films to others for exhibition.

This court expresses no opinion as to whether the conduct of other dealers knowingly participating in the forbidden scheme, but not in competition with Klein in the Wilmington area, can be held to have proximately caused plaintiff's injury.

81. Notes 18 and 19, supra, and accompanying text.

82. Provided, of course, that recovery for the same actual damage is not encompassed in each category. Compare Flintkote Co. v. Lysfjord, 246 F.2d 368, 390 (9 Cir. 1957), cert. denied, 355 U.S. 835, 78 S.Ct. 54, 2 L.Ed.2d 46.

As to the first item of damage, see, e. g., Bigelow v. RKO Radio Pictures, Inc., 327 U.S. 251, 66 S.Ct. 574, 90 L. Ed. 652 (1946); as to the second, compare the category treated initially in Story Parchment Co. v. Paterson Parchment Paper Co., 282 U.S. 555, 561 et seq., 51 S.Ct. 248, 75 L.Ed. 544 (1931).

83. "The wrongdoer is not entitled to complain that they cannot be measured with the exactness and precision that would be possible if the case, which he alone is responsible for making, were otherwise. * * *" Story Parchment, supra, at 563, 51 S.Ct. at 250.

84. Timberlake, note 38, supra, at p. 236 and cases cited.

since the inception of his account with the manufacturer in 1949, and that the notice of refusal to deal resulted in deprivation of future profits which otherwise would have been derived from continued sales of the luggage. Nor is it denied that some loss was suffered in disposing of the existing American stock on hand, and in the establishment of an alternative competitive line, after receipt of the notice of refusal to deal. With the fact of damage thus clearly shown, the question remains whether plaintiff has adequately proved the amount.

Evidence adduced by plaintiff in support of the first item of damages— loss of reasonably anticipated future profits—has been sapped of all probative value by impeachment. In response to an interrogatory submitted by plaintiff, the records of American revealed Klein purchased various dollar volumes of luggage in the years 1951 through 1955.[85] During cross examination of plaintiff's expert accounting witness, counsel for Wanamaker called attention to Klein's federal excise tax returns for the same years, which indicate the dollar volumes of gross sales of all brands of luggage marketed.[86] These figures are tabulated in the margin to facilitate comparison.[87] In the face of Klein's testimony that he sold American luggage at a profit, it is readily apparent that the two sets of figures are hopelessly irreconcilable. If anything, they infer plaintiff consistently sold American luggage below cost. Nor may resort be had to the gross sales reflected in the tax return for computation of profits derived from sales of American luggage. Assuming the accuracy of these figures, they fail to show what portion of the gross sales in each year were derived from American luggage products. The record is thus devoid of any reliable evidence of Klein's profits from the sale of American luggage in the years prior to the refusal to deal. There consequently exists no basis for projection of future anticipated profits. Ascertainment of the amount of this item of damages is hopelessly conjectural. The inability of the court to avoid unwarranted speculation in this connection is not the result of defendants' violation, but rather of plaintiff's failure to come forward with credible proof of past earnings peculiarly within his possession. The court therefore has no alternative but to deny recovery on this ground.

The loss incurred as a result of the hasty disposition of the American line in plaintiff's inventory at the time notice of the refusal to deal was received stands on a different footing. Because

85. See PX 3A.

86. N.T. 130–134; PX 3A.

87.

| | Dollar Volume Gross Annual Sales of Luggage as Indicated by Plaintiff's Federal Excise Tax Return | Dollar Volume Annual Purchases From American Luggage |
|---|---|---|
| 1951 | $ 2,620.00 | $ 3,074.98 |
| 1952 | 3,151.25 | 6,378.03 |
| 1953 | 3,639.00 | 9,857.17 |
| 1954 | 3,983.75 | 12,674.90 |
| 1955 | 5,279.87* | 15,235.65 |
| Totals: | $18,676.87** | $47,220.73** |

\* This figure combines luggage and jewelry sales; no breakdown is available. For purposes of discussion, it may be assumed to show luggage sales exclusively— an assumption most favorable to plaintiff.

\*\* Totals calculated by plaintiff's expert accountant (N.T. 132).

of the suddenness of events necessitating the disposal, plaintiff could do little more than estimate the cost of procurement of the American stock on hand. More precise and specific inventory listings are unavailable. Plaintiff sold a few of the remaining items of the American product line at his usual price until attempts to regain supply proved futile. In contrast to the previous item of damages claimed, here the nature of the restraint imposed upon plaintiff is largely responsible for the element of uncertainty in the proof of damage adduced. Moreover, this uncertainty is not large in magnitude. Defendants are thus in no position to object to the lack of precision in the data submitted as evidence to serve as a basis for computation of these damages. The court is of the opinion that under these circumstances, the proof suffices as a just and reasonable measurement of this phase of damages.

▆▆▆▆▆▆ In addition to assailing its probative worth, defendants object to the admissibility of this evidence because of plaintiff's asserted failure to include this item of damage in the pretrial order. Plaintiff stated in the pretrial order that he expected to prove as a result of the refusal to deal that " * * * he has been, since the date of such refusal, deprived of the opportunity to effect gross annual sales of American Luggage's products in the amount of $14,000 per annum * * * ", based on the business activity of the year preceding the termination.[88] Analysis of precedent reveals that in no case involving total deprivation of goods has the proponent successfully obtained damages measured by gross sales lost as a result of the antitrust violation. Plaintiff may recover the net profit which would have been derived from such sales, but an award of the gross figure would permit recovery of an amount in excess of the actual damage suffered. Notwithstanding that the statement of damages expected to be proved found in the pretrial order is couched in terms of deprivation of gross sales, its legal import is necessarily restricted to loss of reasonably anticipated net profits. A moments reflection will demonstrate that the second item of damages presently claimed may be viewed as one particularized phase of lost profits.[89] The court is therefore of the opinion that proof of this particular element of damage does not deviate from the terms of the pretrial order. Should this conclusion be erroneous, and admission of the assailed evidence work to amend the order, the court deems such a result legally permissible and consistent with fairness. Rule 16 of the Federal Rules of Civil Procedure confers upon the court power to amend the pretrial order in the course of trial to prevent manifest injustice. Defendants do not claim surprise, nor substantial inconvenience suffered as a result of the introduction of this evidence.[90] Since the

---

88. Paragraph (h) of the pretrial order, document No. 72 in the file of the case.

89. Compare Flintkote v. Lysfjord, note 82, supra: " * * * not all nor any two * * * [categories of damage] * * * are necessarily mutually exclusive. * * * " Plaintiff seeks compensation in the form of profits he would have earned, but for the restraints on competition effectuated by defendants. Where a total foreclosure of market access results, viz., denial of supply, damage is measured by reasonably anticipated future net profits. In the situation where the restraint causes diminution of revenue, as distinguished from complete foreclosure, the measure of damages is the amount of the decrease. In this latter case plaintiff has actually incurred the costs of doing business, whence the law permits recovery of the lost increment of gross revenue. In either event, the result is to restore plaintiff to the profit level he would have occupied at the time suit was filed, had there been no unlawful restraint.

90. Rather, they rely on two cases. One of these, Associated Beverages Co. v. P. Ballantine & Sons, 287 F.2d 261 (5 Cir. 1961), involved affirmance of a disallowed attempt to avoid the binding effect of a stipulation, carefully entered into and incorporated by reference into the pretrial order, wherein factual issues were greatly narrowed. Walker v. West Coast Fast Freight, Inc., 233 F.2d 939 (9 Cir. 1956), affirmed a refusal of the District Court to

result of defendants' position would be to deny recovery to plaintiff, the court is of the opinion that the evidence should be admitted to prevent manifest injustice. The court therefore overrules the objection to the admissibility of evidence tending to show the measure of the second category of damages.

The preticketed price serves as a datum for computation of the diminution in revenue suffered in connection with the forced sale of American inventory on hand at the time notice of the refusal to deal issued. Plaintiff had approximately $9,000 worth of American Luggage products on hand at the time the notice of refusal was received. An estimated 5—10% of this amount consisted of models of the series which preceded the Tri-Taper line. Thus approximately $8,100 of the inventory consisted of Tri-Taper.[91] This latter figure represents the purchase price paid to the manufacturer—55% of the preticketed retail price—plus shipping costs estimated as equivalent to 5% of the preticketed price. Prior to the cessation of supply, Klein customarily sold American prod-

ucts at 20% off the preticketed price. During the six or seven months following the time the refusal issued, Klein made a lackadaisical effort to sell the existing American inventory while engaging in futile negotiations to reestablish supply.[92] When it became apparent that this objective was impossible of fulfillment, Klein held several special sales to customers, wherein the American products were offered at 50% of the preticketed price. Klein did not dispose entirely of the American stock in such manner: a portion of this inventory secured by plaintiff at a cost of $1,696.80 (purchase price plus shipping costs) was disposed of at a loss to a Baltimore firm for $1,131.36; another portion costing $1,000, exclusive of shipping charges, was disposed of at the purchase price— plaintiff thus fell short of breaking even on these items by the amount of shipping costs. Disposition of the remainder of the $8,100 Tri-Taper inventory originally on hand was accounted for by the aforementioned special sales to customers at one-half the preticketed price. Plaintiff thus suffered a loss of revenue in the

permit amendment of the pretrial order to include an item of special damage previously omitted. The condition of plaintiff precipitating the damage was known to counsel well in advance of the time of preparation of the pretrial order.

Neither of these cases seem particularly apposite to the present situation, where difficulties of proof beset plaintiff from the outset, and this uncertainty pervaded all phases of the pretrial procedure. It seems particularly appropriate here to recall the admonition of Professor Moore:

" * * * the pretrial order must not be an inexorable decree. Designed to promote litigation on the merits, pre-trial must not, of course, be used to thwart its very objective. * * *" 3 Moore's Federal Practice 1132, ¶ 16.21 (2nd Ed. 1948).

91. N.T. 91, 98. The volume of this Tri-Taper predecessor amounting to approximately $900 was procured by plaintiff for availability to customers needing supplementary pieces for partial sets of these models begun by previous purchases. See note 19, supra. Klein testified that these were purchased from the manufacturer

at reduced rates. While Klein seemingly believed the refusal to deal necessitated prompt sale of these obsolete models along with those of the Tri-Taper series, the court is of the opinion that their disposition was not proximately caused by the antitrust violation, and cannot be held to be part of the resulting injury to plaintiff's business. An additional objection to inclusion of these items in the damage computation is the reduced cost—the exact magnitude of which is unknown—and the consequent risk of an award which exceeds the actual damage suffered. These considerations militate against recovery on the forced disposition of these items and the court has accordingly computed damages exclusively on the basis of the disposition of the Tri-Taper models. The upper bound of the estimated quantity of these models, 10%, has been used to partially compensate, concededly in an arbitrary manner, for the few items in the Tri-Taper series which were sold at Klein's regular price after cessation of supply, and which were not deducted from the $8,100 figure.

92. See note 91, supra.

amount of $4,241.64.[93] Since plaintiff is statutorily entitled to threefold the actual damages proved, he is awarded judgment in the amount of $12,724.92.

■■■ For injunctive relief, plaintiff need not demonstrate with certainty the amount of lost anticipated future profits, he need only adduce proof of the existence of the threat of such loss. This much plaintiff has accomplished,[94] and he is therefore entitled to an injunction to relieve him of the continued prospect of these losses in the future. The antitrust laws secure plaintiff's right to engage in business free of anti-competitive restraints. Plaintiff may have equitable relief enjoining American from refusing to supply him with luggage pursuant to a price fixing conspiracy condemned by the Sherman Act.[95]

■■■ Lastly, the court deems it unnecessary to pass upon the merits of the causes arising under State law which were joined with the antitrust claims in this controversy. In connection with the State causes, plaintiff alleged actual and punitive damages. No purpose would be served therefore by a resolution of the merits of the State claims, because plaintiff has already recovered all actual damages supported by competent evidence in connection with the Sherman Act offense. Punitive damages are awarded in the court's discretion. In view of the treble damage award resulting from the antitrust violation, the court would deny similar additional damages in connection with the State claims, even assuming arguendo that plaintiff would prevail on these causes.

This opinion shall constitute findings of fact and conclusions of law in accordance with Rule 52(a) of the Federal Rules of Civil Procedure, 28 U.S.C.A.

An order in conformity with this opinion may be submitted.

93.

| Dollar Volume Inventory ($8100) Lots Disposed of, (Total Cost of Procurement to Plaintiff = 60% of Aggregate Preticketed Prices —55% Purchase Price to Manufacturer plus 5% Shipping Costs) | Actual Dollar Returns Upon Forced Disposition |
|---|---|
| Total: $8,100.00 | |
| $1,696.80* | $1,131.36 |
| 1,090.80** | 1,000.00 |
| 5,312.40*** | 4,427.00*** |
| | Total: $6,558.36 |

\* Volume sold to Baltimore Firm (N.T. 94).
\*\* Volume sold to Oppenheim and Sherman in New York (5% shipping cost calculated and included in figure shown, N.T. 95).
\*\*\* Volume sold in special sales to customers at half the preticketed price (amounts shown are calculated, N.T. 95).

The items were sold in the normal course of business at 80% of the purchase price. Since they were procured at a total cost to Klein of 60%, the $8,100 would have realized a return of 133⅓%, or $10,800 in the absence of the cessation of supply. The amount of the diminution in revenue proximately resulting from the restraint is therefore $10,800 less $6,558.36, or $4,241.64.

94. See the text accompanying notes 84 and 85, supra.

95. As when damages are sought, plaintiff must show that the violation giving rise to prospective damage detrimentally affects his business or property in a uniquely personal, pecuniary fashion. Ring v. Spina, 84 F.Supp. 403, 406 (D.C.S.D.N.Y. 1949). See note 38, supra.